CLARE E. CONNORS          7936
Attorney General of the State of Hawai'i

NICHOLAS M. MCLEAN       10676
EWAN C. RAYNER            10222
WILLIAM M. LEVINS         10295
CRAIG Y. IHA              7919

Deputy Attorneys General
Dept. of the Attorney General
425 Queen Street
Honolulu, Hawai'i 96813

Attorneys for Governor DAVID IGE,
in his official capacity as Governor
of the State of Hawai'i

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HOLLY CARMICHAEL;<br>TIMOTHY AARON<br>CARMICHAEL; BROOKE<br>MCGOWAN; and RUSSELL<br>HIRSCH,<br><br>        Plaintiffs,<br><br>    v.<br><br>DAVID IGE, in his official capacity<br>as Governor of the State of Hawai'i,<br><br>        Defendant. | Case No. 1:20-cv-00273-JAO-WRP<br><br>**GOVERNOR IGE'S OPPOSITION TO<br>PLAINTIFFS' MOTION FOR A<br>TEMPORARY RESTRAINING<br>ORDER; DECLARATION OF<br>NICHOLAS M. MCLEAN;<br>DECLARATION OF SARAH Y.<br>PARK, M.D.; DECLARATION OF<br>STEVEN HANKINS, M.D.;<br>DECLARATION OF CHRISTOPHER<br>TATUM; DECLARATION OF<br>BRUCE ANDERSON; EXHIBITS "A"-<br>"P"; CERTIFICATE OF SERVICE**<br><br><u>District Judge</u>: Hon. Jill A. Otake<br><u>Magistrate Judge</u>: Hon. Wes Reber Porter<br><u>Hearing</u>: July 2, 2020, at 11:00 AM |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................1

II.    BACKGROUND .................................................................3

     A.    The COVID-19 virus...................................................3

     B.    Emergency orders have stemmed the spread of COVID-19 in Hawaiʻi ...............................................................5

     C.    State and county emergency orders have succeeded in keeping the COVID-19 pandemic in check in Hawaiʻi .......................6

     D.    As the State increases capacity to contain the spread of COVID-19, it begins to carefully lift emergency restrictions ...........................................................7

III.   PLAINTIFFS LACK STANDING................................................9

IV.   PLAINTIFFS FAIL THE TEST FOR INJUNCTIVE RELIEF ....................12

     A.    Plaintiffs are unlikely to succeed on the merits ...................13

         1.    The emergency orders have a real and substantial relation to protecting Hawaiʻi's people during the COVID-19 pandemic ..................................................13

         2.    Plaintiffs' claims fail even under "ordinary" constitutional standards........................................15

            (a)    The right to travel ...........................................15

            (b)    Due process....................................................18

                i.    The State's emergency orders do not violate any substantive due process rights..................................................18

                ii.    The State's emergency orders do not violate any procedural due process rights. .................................................21

(c)     Equal protection ................................................................22

B.     Plaintiffs cannot establish irreparable harm .......................................23

C.     An injunction would not be in the public interest, nor
does the balance of harms favor Plaintiffs ...........................................24

III.     CONCLUSION ..............................................................................25

# TABLE OF AUTHORITIES

**Cases**

*All. for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...............................................................13

*Barwood, Inc. v. D.C.*,
202 F.3d 290 (D.C. Cir. 2000) ..............................................................20

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ...................................................................... 15, 16

*Campbell v. Burt*,
141 F.3d 927 (9th Cir. 1998) ................................................................20

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ................................................................24

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) .............................................................................22

*Coons v. Lew*,
762 F.3d 891 (9th Cir. 2014) ................................................................10

*Cross Culture Christian Ctr. v. Newsom*,
2020 WL 2121111 (E.D. Cal. May 5, 2020).........................................13

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018)..................................................................9

*Dines v. Pacific Ins. Co., Ltd.*,
78 Hawai'i 325, 893 P.2d 176 (1995) ..................................................21

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ..............................................................13

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010)................................................................12

*Edwards v. California*,
314 U.S. 160 (1941) .............................................................................16

*Elim Romanian Pentecostal Church v. Pritzker*,
  2020 WL 3249062 (7th Cir. June 16, 2020) ........................................................5

*Fed'n of California v. Newsom*,
  2020 WL 3056126 (C.D. Cal. June 8, 2020)........................................................19

*Fournerat v. Veterans Administration*,
  2019 WL 8810110 (C.D. Cal. Dec. 19, 2019) ....................................................16

*Franchesci v. Yee*,
  887 F.3d 927 (9th Cir. 2018) ..............................................................................18

*Friends of Santa Clara River v. United States Army Corps of
  Engineers*,
  887 F.3d 906 (9th Cir. 2018).......................................................................... 9, 11

*Gish v. Newsom*,
  2020 WL 1979970 (C.D. Cal. Apr. 23, 2020)....................................................17

*Guzman v. Shewry*,
  552 F.3d 941 (9th Cir. 2009) ..............................................................................19

*Hammler v. Clark*,
  2020 WL 1182515 (E.D. Cal. Mar. 12, 2020) ....................................................12

*Hammler v. Clark*,
  2019 WL 8219737 (E.D. Cal. Dec. 30, 2019)....................................................12

*In re Abbott*,
  954 F.3d 772 (5th Cir. 2020) ..............................................................................14

*In re Rutledge*,
  956 F.3d 1018 (8th Cir. 2020)............................................................................14

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ..................................................................................... *passim*

*Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*,
  423 F. Supp. 3d 947 (D. Haw. 2019) ..................................................................13

*Lance v. Coffman*,
  549 U.S. 437 (2007) ..............................................................................................9

*Lockheed Missile & Space Co. v. Hughes Aircraft Co.*,
   887 F. Supp. 1320 (N.D. Cal. 1995)......................................................12

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................................9

*Marshall v. United States*,
   414 U.S. 417 (1974) ...........................................................................14

*Midgett v. Tri-County Met. Transp. Dist.*,
   254 F.3d 846 (9th Cir. 2001) ..............................................................24

*Monterey Mech. Co. v. Wilson*,
   125 F.3d 702 (9th Cir. 1997)...............................................................24

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015)..............................................................12

*Novak v. United States*,
   795 F.3d 1012 (9th Cir. 2015)..............................................................23

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ...........................................................................11

quoting *Franceschi v. Yee*,
   887 F.3d 927 (9th Cir. 2018)...............................................................19

*Rivera v. Illinois*,
   556 U.S. 148 (2009) ...........................................................................20

*S. Bay United Pentecostal Church v Newsom*,
   2020 WL 2813056 (U.S. May 29, 2020)........................................ 14, 17

*S. Bay United Pentecostal Church v. Newsom*,
   959 F.3d 938 (9th Cir. 2020)...............................................................14

*Saenz v. Roe*,
   526 U.S. 489 (1999) ...........................................................................16

*Sagana v. Tenorio*,
   384 F.3d 731 (9th Cir. 2004)........................................................ 19, 20

*Sanchez v. City of Fresno*,
   914 F. Supp. 2d 1079 (E.D. Cal. 2012) ...............................................16

*Seki ex rel. Louie v. Hawai'i Gov't Employees Ass'n.*,
   133 Hawai'i 385, 328 P.3d 394 (2014) .................................................21

*Six v. Newsom*,
   2020 WL 2896543 (C.D. Cal. May 22, 2020)......................................22

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ..........................................................................9

*Stormans, Inc. v. Wiesman*,
   794 F.3d 1064 (9th Cir. 2015).............................................................18

*Univ. of Haw. Prof'l Assembly v. Cayetano*,
   183 F.3d 1096 (9th Cir. 1999)..............................................................25

*Winter v. NRDC*,
   555 U.S. 7 (2008) ....................................................................... *passim*

*Wisconsin Legislature v. Palm*,
   2 N.W.2d 900 (Wisc. 2020)..................................................................20

*Yu v. Queen's Med. Ctr.*,
   2020 WL 355205 (D. Haw. Jan. 21, 2020) ..........................................25

*Zobel v. Williams*,
   457 U.S. 55 (1982) ...............................................................................15

**Statutes & Constitutional Provisions**

U.S. Const. amend. V ...................................................... *passim*

U.S. Const. amend. XIV ................................................... *passim*

42 U.S.C. § 1983 ...................................................................20

HRS § 127A-1.......................................................................21

HRS § 127A-14.....................................................................20

<u>**GOVERNOR DAVID IGE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**</u>

## I. INTRODUCTION

According to Plaintiffs, "no COVID-19 emergency exists,"[1] "there is no

emergency in Hawaii,"[2] and no need for public health measures to fight it.[3]

Unfortunately, these assertions are wrong. We face an unprecedented *global* public

health emergency—a crisis that, in the absence of an effective state response,

imperils the lives and health of the people of Hawaiʻi. Plaintiffs' challenge to the

State's responses to the COVID-19 pandemic is both factually and legally flawed.

COVID-19 is a highly infectious and deadly disease that already has infected

over 2.1 million Americans and killed more than 120,000. There is no known

vaccine or cure. As the virus spread internationally and in the United States, the

Governor issued incremental emergency orders to limit its spread in Hawaiʻi. The

14-day traveler self-quarantine, stay-at-home, safer-at-home, and act-with-care

orders have protected our healthcare system from being overwhelmed, as tragically

happened in Italy, New York, and elsewhere. According to public health models,

the self-quarantine and other emergency measures averted the more than 25,000

hospitalizations and 5,000 deaths projected for Hawaiʻi by July 23, 2020. As a

direct result, we enjoy one of the lowest infection and mortality rates in the country.

---

[1] Mot. 5-7 (capitalization omitted).
[2] Complaint ¶¶ 44-57 (header).
[3] *Id.*

The people of Hawai'i have sacrificed much during these past months. Their sacrifices have allowed the State to reopen the economy in measured steps designed to prevent a "second wave" of COVID-19 infections and keep the pandemic within the State's healthcare capacity. The risks are exacerbated by our geographic isolation: If our healthcare system were overwhelmed, emergency assistance would not be readily available, and patients could not simply travel elsewhere for treatment. The evolving restrictions represent a delicate balance of public safety and our liberties. The decisions were difficult and often unpopular, but all were based on timely health information, science and careful thought.

Without any meaningful evidence, Plaintiffs urge this Court to stop and undo measures that have saved, and will save, many lives. Plaintiffs' motion should be denied because they do not meet the demanding legal standards required for preliminary injunctive relief. Specifically:

- Plaintiffs lack standing. They do not allege concrete and particularized injuries of the kind that can be redressed by this Court.

- The emergency orders have a "real or substantial relation to the protection of the public health and public safety" and are proper under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The orders also do not impermissibly infringe on Plaintiffs' constitutional rights.

- Even if the deferential *Jacobson* standard did not apply, Plaintiffs cannot establish any likelihood of success on the merits. The orders have a rational basis, and do not impermissibly burden fundamental rights, or make distinctions based on suspect classifications.

- The Governor's actions have been fully consistent with his authority under the Hawai'i Constitution and chapter 127A, Hawai'i Revised Statutes.

- Plaintiffs cannot allege an imminent threat of irreparable harm, much less present evidence that an injunction is necessary to prevent it.

- The public interest does not support granting the relief sought by Plaintiffs. On the contrary: Invalidating the emergency orders would significantly increase the risk that COVID-19 will overwhelm our community.

## II. BACKGROUND

A.   The COVID-19 virus

Since the 2019 novel coronavirus was identified in January 2020 in Wuhan, China, it has spread worldwide. On January 31, the U.S. Department of Health and Human Services declared COVID-19 a national public health emergency. On March 11, the World Health Organization declared a global pandemic. *See* Declaration of Sarah Y. Park, M.D. ¶¶ 6-7. There have been more than 8.2 million COVID-19 confirmed cases and 445,000 deaths worldwide, and over 2.1 million cases and 120,000 deaths in the United States.[4] As of June 23, there have been 819 confirmed cases and 17 deaths in Hawai'i. *Id.* ¶¶ 8-9. The numbers increase daily.

COVID-19 spreads by respiratory droplets expelled when a person breathes, coughs, sneezes, talks, or spits. Personal contact, including shaking hands or touching one's face after touching a contaminated surface, also spreads the disease.

---

[4] The numbers represent those whose death certificates list COVID-19 as a cause of death or a significant condition contributing to death. Park Dec. at ¶ 35.

*Id.* ¶ 10. It can travel at least six feet through the air and survive on surfaces for hours or even days. *Id.* ¶ 11. Its maximum incubation period is 14 days, during which time an infected person may spread the virus without showing symptoms. *Id.* ¶ 12. While many suffer mild to moderate symptoms, those older than 65 or with underlying health issues have an increased risk of serious complications. These include pneumonia-like symptoms, which can lead to death. *Id.* ¶ 13.

This is not a seasonal flu. Our immune systems are familiar with the flu, for which annual vaccines offer protection and effective drugs exist to treat it. Not so with COVID-19, which has overwhelmed healthcare systems around the world. *Id.* ¶¶ 14-15. Without a vaccine, the best way to minimize infection is by "physical distancing" and other behavior modifications. These include: (1) limiting the number of people at gatherings; (2) keeping people at least six feet apart; (3) wearing face coverings to protect others from respiratory droplets; (4) maximizing cleaning to decrease the risk from infected surfaces; and (5) washing hands and not touching one's face. *Id.* ¶ 16. "Experts think that, without controls, each infected person will infect two to three others, causing an exponential growth in the number of cases. Because many of those cases require intensive medical care, infections could overwhelm the medical system." *Elim Romanian Pentecostal Church v. Pritzker*, 2020 WL 3249062, at *1 (7th Cir. June 16, 2020).

B.      Emergency orders have stemmed the spread of COVID-19 in Hawaiʻi

As COVID-19 cases began to appear in Hawaiʻi, the Governor issued an Emergency Proclamation on March 4, 2020. This suspended certain State laws to give agencies flexibility to prevent the spread of disease here. Ex. A pp. 4-7. A Supplementary Proclamation on March 16, suspended additional state laws to ensure the State could respond effectively. Ex. B.

On March 21, the Governor issued a Second Supplementary Proclamation establishing a 14-day self-quarantine for all travelers entering the State, effective March 26. Ex. C p. 1. As with similar measures deemed effective in other countries, the self-quarantine limits the interaction of travelers in the community. Park Dec. ¶ 23. Anyone can travel to Hawaiʻi, but if they do, they must self-quarantine for the incubation period of the disease. Ex. C at p. 1. The travel quarantine applied both to residents and non-residents, *id.*, and its purpose was to protect the community until travelers were no longer likely to be infectious. Park Dec. ¶ 20.

Before instituting the self-quarantine order, the State considered alternative methods such as temperature screenings. *Id.* ¶ 24. Unfortunately, many COVID-19 carriers are asymptomatic, and temperature checks and health questionnaires alone would not identify two thirds of infectious travelers. *Id.*; Ex. K. Moreover, the act of traveling to Hawaiʻi in itself poses a higher risk of COVID-19 infection. Physical distancing is difficult at airports, the associated lines at counters, security screening points, gates, and baggage claim areas. Park Dec. ¶ 27.

5

By March 23, community-based transmission was occurring in Hawaiʻi. *Id.* ¶ 16. The Governor thus responded with a proclamation restricting non-essential businesses, prohibiting gatherings of more than 10 people, closing state parks and beaches, and requiring people to stay at home except for limited activities. Ex. D at pp. 2-8. This aligned with guidance from the Centers for Disease Control and Prevention ("**CDC**"). Park Dec. ¶ 16. On March 31, the Governor issued a Fourth Supplementary Proclamation, extending the 14-day quarantine to interisland travelers. Ex. E at pp. 2-3. This enforced physical distancing measures and limited the interisland spread of COVID-19. Park Dec. ¶ 17.

C.    State and county emergency orders have succeeded in keeping the <u>COVID-19 pandemic in check in Hawaiʻi</u>

Without the travel self-quarantine and other public health measures, health officials estimate that more than 3,900 patients would have needed hospitalization on July 17, 2020 alone. Declaration of Steven Hankins, M.D. ¶ 7. This would have exceeded the State's capacity by more than 2,000 beds. *See id.* ¶¶ 7,10. By instituting emergency measures, Hawaiʻi flattened the curve and now has one of the country's lowest rates of COVID-19 infection and death. Park Dec. ¶ 30.

D.    As the State increases capacity to contain the spread of COVID-19, it <u>begins to carefully lift emergency restrictions</u>

These low rates of infection have bought the State time to strengthen its ability to contain COVID-19 outbreaks. The State has increased daily testing and

contact tracing capacity, and now has adequate stocks of testing supplies and personal protective equipment.

The decrease in active COVID-19 cases, coupled with the increase in capacity to contain outbreaks, have allowed the State and counties to relax their preventative measures. Places of business and other activities, including beaches, retail establishments and hair salons, are reopened. Only high-risk activities where physical distancing is impossible remain closed. *See, e.g.*, Ex. F at pp. 69-72; Ex. I. Moreover, on June 16, the 14-day quarantine was lifted for inter-island travelers. *See* Ex. H at p. 9. This was followed by the Governor's announcement on June 25, that beginning on August 1, travelers who obtain a negative COVID-19 test within 72 hours of arrival will not be subject to the 14 day self-quarantine requirement. Declaration of Bruce Anderson at ¶ 8. Arriving travelers with a temperature above 100.4 degrees or other signs of infection will undergo secondary screening and be offered a COVID-19 test. *Id.* This pre-travel testing program is similar to Alaska's recent decision to lift its quarantine requirements. *Id.* ¶ 7.

The pre-travel testing program is part of a multilayered risk mitigation strategy consisting of: a robust contact tracing program; thermal scanning of arriving travelers to identify potential infections; and a travel and health screening form for all incoming travelers. The State is also evaluating "travel corridors" with

7

international and mainland locations that have low COVID-19 case levels. Park Dec. ¶ 28.

Because the State is still identifying what safety measure are necessary to implement the pre-travel testing program, it is premature to lift the self-quarantine requirement. Indeed, viral "spikes" elsewhere demonstrate the need for continued prudence. According to data from Johns Hopkins University, nineteen states saw a rise in new cases over the past week compared with the previous week.[5] Park Dec. ¶ 29. Moreover, as Hawai'i has moved through its reopening process, cases have risen here as well. While the increase is concerning, Hawaii's deliberate and thoughtful approach allows the State to continue reopening. This is in contrast to other states, some of which have had to slow or retract their reopening plans.

## III.   PLAINTIFFS LACK STANDING

Plaintiffs' allegations lack the concrete and particularized injuries-in-fact needed to establish Article III standing. "A plaintiff seeking relief in federal court must establish the three elements that constitute the 'irreducible constitutional minimum' of Article III standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992): (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

---

[5] These include Alaska, Arizona, Arkansas, Florida, Georgia, Kentucky, Michigan, Nevada, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, South Carolina, South Dakota, Utah, Vermont and Washington.

decision." *Friends of Santa Clara River v. United States Army Corps of Engineers*, 887 F.3d 906, 918 (9th Cir. 2018).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quotation omitted).[6] "[T]he threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quotation omitted).

*First*, Plaintiffs do not allege any actual, imminent, and concrete injuries caused by the 14-day travel quarantine. Holly Carmichael gives no reason why she cannot travel to her condo on Maui or take her trips. She merely floats speculative "injuries" that the self-quarantine might cause, such as an inability to go to a hardware store to address unspecified problems at her condo, and an inability to take out the trash. Carmichael Decl. ¶ 10-13. But speculative fears and mere inconveniences cannot establish standing.[7]

---

[6] "[A] generalized grievance that is plainly undifferentiated and common to all members of the public," *Lance v. Coffman*, 549 U.S. 437, 440-41 (2007) (quotations omitted), will not support standing.

[7] "[M]ere inconvenience is not an injury in fact." *Harris v. Blueray Techs. Shareholders, Inc.*, 669 F. Supp. 2d 1225, 1228 (E.D. Wash. 2009); *see Rechnitz v. Transamerica Life Ins. Co.*, 2018 WL 5267184, at *4 (C.D. Cal. Apr. 6, 2018)

Russell Hirsch's claims also fail. He gives no reason why he cannot travel to Hawaiʻi and celebrate his daughter's graduation, either during his 14-day self-quarantine or afterwards. Complaint ¶¶ 70-74. Hirsch cannot create standing by imagining a possible lawsuit or expenses from possibly having to hire an electrician. *Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."); *id.* at 898 (allegation of possible financial harm "that has not yet occurred and may never occur" could not establish standing because "[s]uch speculative alleged injuries present a dispute that . . . 'is not ripe for court review.'" (quoting *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 732 (1998))).

Brooke McGowan's claims fail too. She alleges plans to travel *from* Hawaiʻi *to* the Mainland, *see* McGowan Declaration, ¶ 3-6, which the self-quarantine requirement does not impinge. She does not state how the self-quarantine prevents

---

(inconveniences "did not place Plaintiffs at imminent risk of harm and thus did not give rise to a concrete injury that merits standing."); *Jamison v. Bank of Am., N.A.*, 2017 WL 3394120, at *4 (E.D. Cal. Aug. 8, 2017).

her from visiting family on the mainland. Without causation between the claimed harm and challenged rule, there is no standing.[8]

*Second*, Plaintiffs have alleged no concrete harm from the categorization of businesses as "non-essential" or "essential." Plaintiffs simply allege the categories are "arbitrary," and deprived them of the opportunity to make a living. Complaint ¶ 120. They further say: "There is no compelling reason to shut down vacation rental apartments when other retail stores are allowed to remain open." Mot. 18. But no plaintiff has declared that they are prevented from operating *any* business, much less a vacation rental. And even if they had alleged an injury-in-fact regarding vacation rentals, such injury would not be "fairly traceable to the challenged conduct of the defendant," or "likely to be redressed by a favorable judicial decision." *Friends of Santa Clara River*, 887 F.3d at 918. Short-term "vacation" rentals are regulated by county orders and actors not before this Court. Exs. N-P "There is no standing if, following a favorable decision, whether the injury would be redressed would still depend on the unfettered choices made by independent actors not before the courts." *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quotation omitted).

## IV. PLAINTIFFS FAIL THE TEST FOR INJUNCTIVE RELIEF

---

[8] *See Lujan v. Defs. of Wildlife*, 504 U.S. at 560 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." (cleaned up)).

"An injunction is . . . an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. NRDC*, 555 U.S. 7, 22, 32 (2008)).[9] "A party seeking a . . . preliminary injunction simply cannot prevail when that motion is unsupported by evidence." *Hammler v. Clark*, 2019 WL 8219737, at *1 (E.D. Cal. Dec. 30, 2019).[10] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Kaiser Found. Health Plan, Inc. v. Queen's Med. Ctr., Inc.*, 423 F. Supp. 3d 947, 951 (D. Haw. 2019) (quoting *Winter*, 555 U.S. at 20).[11] Plaintiffs cannot meet their burden.

## A.   Plaintiffs are unlikely to succeed on the merits

---

[9] "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Six v. Newsom*, 2020 WL 2896543, at *3 (C.D. Cal. May 22, 2020) (quoting *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995)).

[10] *Adopted*, 2020 WL 1182515 (E.D. Cal. Mar. 12, 2020).

[11] "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)."In the Ninth Circuit, courts may also issue temporary restraining orders when there are 'serious questions going to the merits' and a 'balance of hardships that tips sharply towards the plaintiff' so long as the remaining two *Winter* factors are present." *Cross Culture Christian Ctr. v. Newsom*, 2020 WL 2121111, at *3 (E.D. Cal. May 5, 2020) (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

1.   The emergency orders have a real and substantial relation to
protecting Hawai'i's people during the COVID-19 pandemic

Plaintiffs cannot show that the emergency orders have "*no real or
substantial relation* to the protection of the public health and public safety,"
*Jacobson*, 197 U.S. at 31 (emphasis added). In *Jacobson*, the Supreme Court held
that constitutional rights "may at times, under the pressure of great dangers" be
restricted "as the safety of the general public may demand." *Id*. at 29. Vitally, "a
community has the right to protect itself against an epidemic of disease which
threatens the safety of its members." *Id*. at 27. When the government must protect
its people during a pandemic, its actions do not violate the Constitution unless they
are "arbitrary" or "unreasonable"—*i.e.*, whether the requirements have "no real or
substantial relation to [their] objects, or [are], beyond all question, a plain, palpable
invasion of rights secured by the fundamental law." *Id*. at 31.

The Supreme Court, Ninth Circuit, and other courts have applied *Jacobson*
during the COVID-19 pandemic. As the Ninth Circuit observed, "[w]e're dealing
here with a highly contagious and often fatal disease for which there presently is
no known cure"—and "if a '[c]ourt does not temper its doctrinaire logic with a
little practical wisdom, it will convert the constitutional Bill of Rights into a
suicide pact.'" *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939
(9th Cir. 2020) (quotation omitted). Concurring in the Supreme Court's decision

denying injunctive relief in that same case, Chief Justice Roberts made clear that

*Jacobson* controls during the COVID-19 pandemic:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.

*S. Bay United Pentecostal Church v Newsom*, 2020 WL 2813056, at *1-2 (U.S.

May 29, 2020) (Roberts, C.J., concurring).[12]

Such is the case here. Plaintiffs cannot seriously maintain that the COVID-

19 pandemic is not an extreme global health crisis.[13] As discussed above, the self-

quarantine orders were designed to prevent the importation of COVID-19 cases

into the State and between islands. Other orders, such as restrictions on non-

essential businesses, were necessary physical distancing measures to stem the

---

[12] *See also, e.g.*, *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) ("the district court's failure to apply the *Jacobson* framework produced a patently erroneous result."); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (similar).

[13] The data concerning COVID-19 in the United States is unassailable: (1) more than 120,000 people died from the disease between January 2020 to June 2020 and (2) in the first five months of 2020, there were twice as many COVID-19 related deaths as compared to annual deaths from the seasonal flu. *Id.* ¶ 38.

community transmission of any COVID-19 cases that were present. Park Dec. ¶ 16. Because these measures are the most effective means to combat the spread of COVID-19, they bear a "real" and "substantial relation" to protecting the people of Hawai'i and easily satisfy the *Jacobson* standard.

2.  Plaintiffs' claims fail even under "ordinary" constitutional standards

Even without the highly deferential *Jacobson* standard, Plaintiffs' claims still fail under ordinary constitutional standards.

(a)  The right to travel

"The federal guarantee of interstate travel . . . protects interstate travelers against . . . the erection of actual barriers to interstate movement and being treated differently from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276-77 (1993) (quotation omitted)). The Governor's emergency proclamations do neither. The Supreme Court has held that criminalizing the entry of indigent persons into a state violated the right to travel. *Edwards v. California*, 314 U.S. 160, 168 (1941). However, the Court also held that conditioning welfare benefits on a full year of residency in a state does *not* implicate the right to travel because it does not create a direct obstacle to free movement and entry into the state. *Saenz v. Roe*, 526 U.S. 489, 501 (1999).[14] Moreover, "a law having an incidental impact on travel but having a purpose other than restriction of the right

---

[14] *See id.* at 501 ("we think the State is correct when it argues that the statute does not directly impair the exercise of the right to free interstate movement").

to travel, and which does not discriminate among classes of persons by penalizing the exercise by some of the right to travel, is constitutionally permissible." *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1110 (E.D. Cal. 2012) (citation omitted). Restrictions on *intra*state movement do not violate the federal constitutional right to *inter*state travel, *Bray*, 506 U.S. at 277, and "neither the Supreme Court nor the Ninth Circuit has recognized a right to intrastate travel." *Fournerat v. VA*, 2019 WL 8810110, at *5 (C.D. Cal. Dec. 19, 2019).

People remain free to enter, leave and migrate to Hawaiʻi. Given the present crisis, however, those who travel to the State must self-quarantine for 14 days to ensure they are not infectious and will not spread COVID-19. As the disease does not discriminate, neither does the policy: It applies to visitors and residents alike.

Even if the self-quarantine requirement *were* viewed as a direct barrier to entry, it would satisfy heightened constitutional scrutiny. Protecting Hawaiʻi's people from the further spread of COVID-19 and preventing the health care system from being overwhelmed are manifestly compelling state interests. As stated above, the emergency proclamations were intended to and have saved lives.[15] The self-quarantine requirement is also narrowly tailored. It extends no longer than the virus's 14-day incubation period. Park Dec. ¶ 20. Nor have testing or temperature

---

[15] *See, e.g.*, *Gish v. Newsom*, 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020) ("[S]lowing the spread of COVID-19" is a compelling state interest).

16

screenings been feasible, adequate standalone alternatives. *Id.* at 24. Alternatives are constantly assessed, and State "officials are actively shaping their response to changing facts on the ground" in this "dynamic and fact-intensive matter[.]" *South Bay*, 2020 WL 2813056, at *2 (Roberts, C.J., concurring).

As part of this ongoing assessment, the State will soon be able to lift the self-quarantine requirement as part of a pre-travel testing program, which will be implemented in conjunction with enhanced health screening measures. Anderson Dec. at ¶¶ 7-10. This can only occur, however, after State officials are able to implement such health and safety measures. *Id.* If done prematurely, we risk an unmanageable increase in COVID-19 infections similar to those occurring in states that eased protective measures before ready. Park Dec. at ¶¶ 22-28.

(b)   Due process

Plaintiffs' due process claims (Mot. 14)[16] fail because the emergency orders (1) do not infringe a fundamental right under substantive due process and (2) are "rationally related to legitimate government interests." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1088 (9th Cir. 2015).

---

[16] Plaintiffs' claims fail, whether considered as an-applied challenge or a "facial" challenge—which requires "establishing that no set of circumstances exists under which the Act would be valid, *i.e.,* that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quotation omitted).

i.    The State's emergency orders do not violate any substantive due process rights

"The range of liberty interests that substantive due process protects is narrow and only those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Franchesci v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018). Courts "must be reluctant to expand the concept of substantive due process and must exercise the utmost care whenever . . . asked to break new ground in this field." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1087 (9th Cir. 2015) (quotation omitted). Any right "must be carefully stated and narrowly identified." *Id*.

Plaintiffs suggest that strict scrutiny applies because "the right to freely come and go from one's home is a fundamental right." Mot. 15. But there is no "deeply-rooted" right to be free from self-quarantine obligations—in one's own home—during a pandemic.[17] And "[t]he right to work is not a fundamental right; laws affecting the right to work are subject to rational basis review." *Prof'l Beauty Fed'n of California v. Newsom*, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020)

---

[17] "Substantive due process has . . . been largely confined to protecting fundamental liberty interests, such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.'" *Six v. Newsom*, 2020 WL 2896543, at *5 (C.D. Cal. May 22, 2020) (quoting *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018)). Just as a temporary inconvenience does not create standing, Plaintiffs cannot "convert[] . . . temporary inconvenience into a substantive due process claim." *Id.* at *7.

(citing cases).[18] The Supreme Court has "never held that the right to pursue work is a fundamental right," and so "the 'generalized' right to choose one's employment 'is . . . subject to reasonable government regulation." *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004). Since the challenged order has a legitimate purpose—protection of public health (*see* Park Dec. ¶ 21)—and since Plaintiffs cannot show there are *no* "plausible, arguable, or conceivable reasons for the State's designations of essential and non-essential businesses," *id.*, Plaintiffs' substantive due process challenge must fail.[19]

Plaintiffs also seem to raise a federal constitutional claim based on an alleged violation of state law. Mot. 20-21. But "[a]s a general rule, a violation of state law does not lead to liability under § 1983." *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cir. 1998).[20] In any event, there has been *no* violation of HRS § 127A-14(d). That statute states that "[a] state of emergency . . . shall terminate

---

[18] *See, e.g.*, *Guzman v. Shewry*, 552 F.3d 941, 954 (9th Cir. 2009) ("[A]ll cases recognizing such a right have 'dealt with a complete prohibition on the right to engage in a calling, and not [a] sort of brief interruption." (quotation omitted)).

[19] The Court's review in this area, even putting *Jacobson* aside, is narrow and deferential: "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (quotation omitted).

[20] *See Rivera v. Illinois*, 556 U.S. 148, 160 (2009) ("errors of state law do not automatically become violations of due process"); *Barwood, Inc. v. D.C.*, 202 F.3d 290, 294 (D.C. Cir. 2000) ("to treat a violation of state law as a violation of the Constitution is to make the federal government the enforcer of state law" (quotation omitted)).

automatically sixty days after the issuance of a proclamation of a state of emergency." This limit assures that measures contained in an emergency proclamation do not continue indefinitely or beyond the period of an emergency. However, the statute contains no language prohibiting the Governor from using emergency powers to continue measures needed to fight a *continuing* emergency. Here, the Governor has done just that: he issued supplemental proclamations that re-assessed and declared a continuing COVID-19 state of emergency. Each time, he enacted measures appropriate to then-existing health data and circumstances.[21]

According to Plaintiffs, the Governor lacks authority to address *any* emergency lasting more than 60 days. This is absurd, and would prevent the Governor from responding effectively, no matter how serious, long-lasting, or evolving the nature of the emergency. Plaintiffs' reading of Chapter 127A (and resulting chaos) is plainly inconsistent with the statutory language conferring broad emergency powers on the Governor. Reflecting the Legislature's intent,[22] the

---

[21] *Wisconsin Legislature v. Palm*, 2 N.W.2d 900 (Wisc. 2020), is inapposite. There, a divided Wisconsin Supreme Court held that the Secretary-designee of the State Department of Health Services exceeded her authority in certain respects. The court made clear that the governor's power to enact emergency proclamations was not before it. *Id*. at 914.

[22] *See Seki ex rel. Louie v. Hawaiʻi Gov't Employees Ass'n.*, 133 Hawaiʻi 385, 402, 328 P.3d 394, 411 (2014) (statutes read "in the context of the entire statute and . . . consistent with its purpose[.]" (quotation omitted)). The purpose of HRS Chapter 127A was to grant to the Governor broad powers in emergencies to respond to evolving and unpredictable conditions. This included "confer[ring]

20

statute contains no language prohibiting extending an emergency period. In any event, each supplemental proclamation related to the COVID-19 emergency is based on a standalone assessment of circumstances and public health data. Each supplemental proclamation also was issued prior to the 60-day expiration of the preceding proclamation, ensuring continuity and clarity.

ii.     The State's emergency orders do not violate any procedural due process rights.

If Plaintiffs are asserting a *procedural* due process claim as well as a *substantive* due process claim, *see* Complaint ¶138-39, that claim also fails. "[G]overnmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Six v. Newsom*, 2020 WL 2896543, at \*8 (C.D. Cal. May 22, 2020) (quotation omitted). "Hence, this claim is not likely to succeed on the merits, nor does it raise a serious question going to the merits." *Id.*

(c)     Equal protection

---

upon the governor . . . the emergency powers necessary to prepare for and respond to emergencies or disasters[.]" HRS § 127A-1(a)(2). Indeed, the Legislature expressly intended "to provide for and confer *comprehensive powers*," and it directed that the laws in this area "shall be *liberally construed* to effectuate [their] purposes[.]" HRS § 127A-1(c) (emphasis added). Section 127A-14(d) cannot be read to "create[] an absurd or unjust result." *Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai'i 325, 337, 893 P.2d 176, 188 (1995).

21

Any equal protection claims similarly fail because Plaintiffs cannot show that the State treats *similarly situated* individuals differently. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). The emergency orders instead treat certain businesses and activities differently *because they present different degrees of risk to the public health*. Park Dec. ¶ 16.

Nor can Plaintiffs show that designating some businesses as "essential" and others as "non-essential" (Mot. 17-18) violates the Equal Protection clause. Plaintiffs specifically allege that there is no rational basis for treating vacation rental apartments differently from retail stores. Mot. 18. That is not so. The effectiveness of the quarantine in limiting viral spread depends on the ability of transitory accommodations to support the self-quarantine requirements. Hotels and resorts offer front desk service, cleaning and maintenance personnel, and staff who are available to communicate with and assist guests undergoing self-quarantine. Declaration of Christopher Tatum at ¶¶ 5-7. This ensures that travelers under self-quarantine can more readily seek assistance. *Id.* Staff also can assist health authorities in locating and communicating with travelers if necessary. *Id.* None of this assistance is typically available at a vacation rental. *Id.*. Plaintiffs' claim that these determinations are the result of "lobbying" or "well-connected industries" is speculative and wrong. Mot. 17-18. Rational basis review applies—and "equal protection is not a license for courts to judge the wisdom, fairness, or logic of

22

legislative choices[.]" *Novak v. United States*, 795 F.3d 1012, 1023 (9th Cir. 2015).

"Where, as here, rational basis review applies and there are plausible reasons for

[the] action, [the Court's] inquiry is at an end." *Id.*

      B.    <u>Plaintiffs cannot establish irreparable harm</u>

      Their failure on the merits aside, Plaintiffs cannot "demonstrate that

irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

"[A] plaintiff seeking an injunction against a local or state government must

present facts showing a threat of immediate, irreparable harm before a federal court

will intervene." *Midgett v. Tri-County Met. Transp. Dist.*, 254 F.3d 846, 851 (9th

Cir. 2001).[23] Plaintiffs cannot even establish standing, let alone irreparable harm.

*See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)

("Speculative injury does not constitute irreparable injury sufficient to warrant

granting a preliminary injunction."). Although "an alleged constitutional

infringement will often alone constitute irreparable harm," *Monterey Mech. Co. v.

Wilson,* 125 F.3d 702, 715 (9th Cir. 1997) (quotation omitted), a party seeking an

---

    [23] *See also Cottrell*, 632 F.3d at 1135 ("[P]laintiffs may not obtain a preliminary injunction unless they can show that irreparable harm is likely to result in the absence of the injunction."); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must *demonstrate* that it will be exposed to irreparable harm."); *G. v. Hawaiʻi DHS*, 2009 WL 2877597, at *5 (D. Haw. Sept. 4, 2009) ("Because Plaintiffs have failed to establish a likelihood of irreparable harm . . . the Court need not consider their likelihood of success on the merits, the balance of equities, or the public interest.").

injunction must "demonstrate that it will be exposed to some significant risk of irreparable injury." *Associated Gen. Contractors v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). Plaintiffs here have not even attempted to show irreparable harm, much less met the exacting standard for injunctive relief.[24]

C.     An injunction would not be in the public interest, nor does the balance of harms favor Plaintiffs

Plaintiffs also fail the final two *Winter* factors—the public interest and the balance of harms. "To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). Plaintiffs' proposed injunction would increase the potential for COVID-19 transmission and create catastrophic risk to public health. Plaintiffs' motion should thus be denied because the relief sought "could harm the public interest." *Yu v. Queen's Med. Ctr.*, 2020 WL 355205, at *8 (D. Haw. Jan. 21, 2020).

---

[24] *See id.* at 1412 ("While allegations of constitutional infringement might be sufficient to presume irreparable harm, in this case, . . . the constitutional claim is too tenuous[.]" (quotation omitted)).

## III.   CONCLUSION

For the reasons set forth herein, the Court should deny Plaintiffs' motion.[25]

DATED: Honolulu, Hawai'i, June 25, 2020.

/s/ Nicholas M. McLean
NICHOLAS M. MCLEAN
EWAN C. RAYNER
WILLIAM M. LEVINS
CRAIG Y. IHA
Deputy Attorneys General

Attorneys for Governor DAVID IGE,
in his official capacity as Governor of the
State of Hawai'i

---

[25] Injunctive relief is unwarranted. But if the Court should grant any form of relief, it should not waive the bond requirement. Injunctive relief would impose extraordinary costs on the State—administrative/compliance costs and costs associated with a likely resurgence of COVID-19. Without a showing that Plaintiffs cannot post a bond, one should be required.