IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HOLLY CARMICHAEL; TIMOTHY AARON CARMICHAEL; BROOKE MCGOWAN; and RUSSELL HIRSCH, <br><br> Plaintiffs, <br><br> vs. <br><br> DAVID IGE, in his official capacity as Governor of the State of Hawaii, <br><br> Defendant. | CIVIL NO. 20-00273 JAO-WRP <br><br> ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE |

**ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Plaintiffs Holly Lynn Carmichael and Timothy Aaron Carmichael (collectively, "the Carmichaels") and Russell Hirsch ("Hirsch"), non-residents of Hawaiʻi, and Brooke McGowan ("McGowan"), a resident of Hawaiʻi, challenge Defendant Governor David Ige's ("Defendant") Emergency Proclamations regarding COVID-19 as unconstitutional under the Fifth and Fourteenth Amendments to the Constitution.  Claiming that there is no emergency in Hawaiʻi or the United States, Plaintiffs seek temporary injunctive relief enjoining

Defendant from enforcing the 14-day quarantine requirements[1] of the Emergency Proclamations and an order to show cause why a preliminary injunction should not issue.  The Court DENIES the Application for the following reasons.

<u>BACKGROUND</u>

Like many states across the nation and countries around the world, Hawaiʻi has issued a series of Emergency Proclamations "to limit the spread of COVID–19, a novel severe acute respiratory illness" with "no known cure, no effective treatment, and no vaccine."  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (mem.) (Roberts, C.J., concurring).  Further complicating efforts to contain COVID-19 is the fact that individuals who are "infected but asymptomatic . . . may unwittingly infect others."  *Id.*  As of today, there are more than 10,533,779 cases and 512,842 deaths globally.  *See* https://covid19.who.int/ (last visited July 2, 2020).  The United States has seen 2,679,230 cases and 128,024 deaths.[2]  *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 2, 2020).  Defendant contends that, due at least in part to the measures implemented in Hawaiʻi to address the pandemic,

---

[1]  At the hearing, Plaintiffs clarified that they only seek temporary injunctive relief related to the quarantine requirement.

[2]  This reflects an increase of 54,357 cases and 725 deaths since yesterday.  *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 2, 2020).

COVID-19 numbers have remained relatively low, with 946 cases and 18 deaths to date.  *See* https://health.hawaii.gov/coronavirusdisease2019/ (last visited July 2, 2020).

I.    Factual History

   A.    Plaintiffs

      1.    The Carmichaels

Residents of California, the Carmichaels visit Maui up to ten times per year to use their vacation condominium in Lahaina.  Compl. ¶¶ 58–59.  They place the unit in a rental pool when it is unoccupied.  *Id.* ¶ 59.  The Carmichaels made travel arrangements to visit Hawaiʻi on April 1, 2020, but cancelled after learning of the quarantine.  *Id.* ¶¶ 60–61.  As Defendant extended the quarantine, the Carmichaels cancelled all rescheduled travel plans.  Appl., Decl. of Holly Carmichael ("Carmichael Decl."), ECF No. 12-7 ¶¶ 4–8.  Because the quarantine remains in effect, the Carmichaels have been unable and/or unwilling to travel to Maui.  Compl. ¶¶ 62–63.  They have concerns about necessary repairs to their unit, which "often require[] interaction with local tradesmen and always require[] at least one drive into Kahului for necessary parts, followed by a visit to the Lahaina Ace Hardware for items [they] later discover are also needed."  Carmichael Decl. ¶¶ 9–12.  And they claim that once at their unit, the Emergency Proclamations prohibit them from exiting their unit to dispose of trash.  *Id.* ¶ 13.

### 2.   Brooke McGowan

McGowan resides in Hawaiʻi and had plans to travel to the mainland to assist her daughter with a federally funded green roofs project this summer[3] and visit her 90-year-old grandmother who is suffering from Alzheimer's.  *Id.* ¶¶ 66–67.  Without further explanation, she claims it is impossible to do both and complete a quarantine upon returning to Hawaiʻi.  *Id.* ¶ 68.

### 3.   Russell Hirsch

Hirsch, a Nevada resident, owns two properties in Hawaiʻi—a farm in Hilo on Hawaiʻi Island where he grows fruit trees, and a home in Kailua on Oʻahu.  *Id.* ¶ 70.  Hirsch cites three reasons he wishes to travel to Hawaiʻi:  (1) maintain his properties—tend to his fruit trees in Hilo and perform electrical work on his Kailua home that would cost substantially more if completed by an electrician; (2) celebrate his daughter's graduation where she grew up; and (3) address a potential lawsuit involving the removal of his fruit trees.  *Id.* ¶¶ 71–73.  Hirsch alleges that the quarantine prevents him from doing any of this.  *Id.* ¶ 74.

### B.   Emergency Proclamations

As COVID-19 appeared in Hawaiʻi, Defendant issued an Emergency Proclamation on March 4, 2020, authorizing the expenditure of State monies, and

---

[3]  In her Declaration, McGowan characterizes it as a home construction project.  Appl., Decl. of Brooke McGowan ("McGowan Decl."), ECF No. 12-8 ¶ 3.

suspending specified Hawaiʻi statutes.  Opp'n, Ex. A, ECF No. 34 at 4–7.

Defendant's March 16, 2020 Supplementary Proclamation suspended additional

State laws so the State could effectively respond to the emergency.  *Id.*, Ex. B,

ECF No. 34-1.

On March 21, 2020, Defendant issued a Second Supplementary

Proclamation that imposed a 14-day quarantine, effective March 26, 2020,

applying to *all persons entering Hawaiʻi*, both residents and non-residents alike,

with a few exceptions related to emergency and critical infrastructure functions.

*Id.*, Ex. C, ECF No. 34-2 at 1.  The Second Supplementary Proclamation imposed

misdemeanor criminal penalties for violations of the quarantine rules.  *Id.*

In response to the community-based transmission of COVID-19, Defendant

issued a Third Supplementary Proclamation on March 23, 2020, imposing a stay-

at-home mandate with limited exceptions.  *Id.*, Ex. D, ECF No. 34-3 at 2.  This

Third Supplementary Proclamation restricted non-essential businesses, identified

prohibited and permissible activities outside the home, prohibited gatherings of

more than 10 people, and established social distancing requirements.  *Id.* at 2–8.

As with the quarantine, violation of the stay-at-home provisions is a misdemeanor.

*Id.* at 8.

On March 31, 2020, Defendant issued a Fourth Supplementary

Proclamation, extending the quarantine to interisland travelers, effective April 1,

2020, with several identified exceptions.  Opp'n, Ex. E, ECF No. 34-4 at 2.  The criminal provisions extended to these quarantine rules.  *Id.*

Defendant's Fifth Supplementary Proclamation, issued on April 16, 2020, implemented enhanced social distancing requirements and an eviction moratorium. Appl., Ex. 6, ECF No. 12-2 at 33–40.  On April 25, 2020, Defendant issued a Sixth Supplementary Proclamation amending and restating all prior proclamations and orders related to the COVID-19 emergency.  *Id.*, Ex. 7, ECF No. 12-2 at 42–75.

The May 5, 2020 Seventh Supplementary Proclamation eased restrictions and authorized the reopening of certain business and activities, subject to social distancing guidelines, transitioning from a stay-at-home phase to a safer-at-home phase.  Opp'n, Ex. F, ECF No. 34-5.  The May 18, 2020 Eighth Supplementary Proclamation extended the quarantine and eviction moratorium until June 30, 2020.  *Id.*, Ex. G, ECF No. 34-6.  It also authorized the next phase of reopening: the act-with-care phase.  *Id.*

On June 10, 2020, Defendant issued a Ninth Supplementary Proclamation lifting the interisland quarantine on June 16, 2020 while extending the interstate quarantine until July 31, 2020.  Opp'n, Ex. H, ECF No. 34-7 at 9, 31.

On June 25, 2020, Defendant announced the August 1, 2020 implementation of the trans-Pacific pre-testing program, which allows travelers to avoid quarantine by supplying a negative COVID-19 test obtained within 72 hours of arrival in

Hawai'i.  Opp'n, Decl. of Bruce S. Anderson, Ph.D ("Anderson Decl."), ECF No.

33-5 ¶ 8.  Those with temperatures exceeding 100.4 or exhibiting other signs of

infection will undergo secondary screening and be offered a COVID-19 test.  *Id.*

II.   Procedural History

Plaintiffs commenced this action on June 15, 2020, alleging that Defendant's

Emergency Proclamations violate their Fifth and Fourteenth Amendment rights.

They assert the following claims:  Count 1 – Fifth Amendment violation of the

right to travel; Count 2 – Fifth Amendment due process violation of the right to

liberty; Count 3 – Fourteenth Amendment equal protection violation; and Count 4

– Fifth and Fourteenth Amendment due process and equal protection violations

caused by the Emergency Proclamations.  Plaintiffs request an order temporarily,

preliminarily, and permanently enjoining Defendant from enforcing his Emergency

Proclamations or otherwise interfering with their constitutional rights, and for an

award of attorneys' fees and costs.  Compl. at 27.

The present Application followed on June 17, 2020.  ECF No. 12.

LEGAL STANDARD

The standards governing temporary restraining orders ("TRO") and

preliminary injunctions are "substantially identical."  *Washington v. Trump*, 847

F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted); *see Kaiser Found. Health

Plan, Inc. v. Queen's Med. Ctr., Inc.*, 423 F. Supp. 3d 947, 951 n.1 (D. Haw.

2019).  To obtain preliminary injunctive relief, a plaintiff must establish:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).  Where, as here, the government is a party, the last two factors merge.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The Ninth Circuit also employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  The issuance of a preliminary injunction may be appropriate when there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"; it is "never awarded as of right." *Winter*, 555 U.S. at 22, 24 (citations omitted).  "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly

mindful, in exercising their sound discretion, of the "public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

Moreover, mandatory injunctions ordering affirmative action by a defendant, which is what Plaintiffs request here, go "well beyond simply maintaining the status quo . . . [and are] particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979), *as amended* (1980)). Mandatory injunctions are "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party," *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (citation omitted), or "extreme or very serious damage will result." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation omitted). They "are not issued in doubtful cases." *Id.* (citation omitted). "The court's finding of a strong likelihood that plaintiffs would succeed on the merits of their claims also evidences a conclusion that the law and facts clearly favor plaintiffs, meeting the requirement for issuance of a mandatory preliminary injunction." *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1157 (9th Cir. 2007) (citation omitted).

<u>DISCUSSION</u>

Plaintiffs request a TRO enjoining Defendant, his agents, employees, successors in office, and the political subdivisions of the State, from enforcing or

requiring compliance with:  (1) the 14-day quarantine or (2) prohibitions on Plaintiffs' due process and equal protection rights, including the right to travel. Appl. at i.  Plaintiffs also ask that Defendant be ordered to show cause why a preliminary injunction should not issue.  *Id.*

I.      Standing

Defendant argues that Plaintiffs lack standing because they have not alleged concrete and particularized injuries-in-fact.  Plaintiffs counter that they have standing because:  (1) the quarantine "substantially burdened" the Carmichaels and has prevented them from traveling to their vacation condominium on Maui; (2) "the quarantine period makes it functionally impossible" for McGowan to visit her daughter or care for her grandmother on the mainland; and (3) the quarantine prevents Hirsch from traveling to both his properties during a single short visit; prevents him from attending to any business at either property during the quarantine period; and "substantially burdens" his family's plans to travel to Hawai'i to celebrate his daughter's graduation.  Reply, ECF No. 40 at 2–3.

A plaintiff must demonstrate three elements to establish that he or she has standing to sue in federal court:  (1) "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury must be fairly traceable to the defendant's conduct; and (3) the injury can be redressed through adjudication. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted);

*see Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1547 (2016).  A plaintiff exclusively seeking declaratory and injunctive relief must additionally "show a very significant possibility of future harm."  *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citation omitted).

Plaintiffs' bare and conclusory allegations, both in the Complaint and in their declarations, reveal a common theme:  they have *elected* not to travel—whether to or from Hawai'i—because they do not want to be quarantined.  Less obvious are the injuries they purport to have suffered or are in imminent danger of sustaining as a result of the Emergency Proclamations.  For example, McGowan wants to travel to the mainland, i.e., *leave* Hawai'i, and has not explained how quarantining upon her return constitutes a very significant possibility of future harm.  Because the Court denies the request for TRO, however, it declines to reach standing at this time.

II.   <u>Plaintiffs Are Not Entitled to Injunctive Relief</u>

    A.   <u>Strong Likelihood of Success on the Merits/Serious Questions Going to the Merits</u>[4]

---

[4]  This is the only element (of four) addressed by Plaintiffs in their Application. Because it is Plaintiff's burden to prove entitlement to injunctive relief, and they failed to present a prima facie case as to all required elements in their Application, it can be denied on this basis alone regardless of whether Plaintiffs eventually addressed the remaining elements in their Reply.  Even considering those arguments, though, Plaintiffs still have not met their burden.

Chief Justice Robert's concurrence in *South Bay United Pentecostal Church v. Newsom* informs the Court's analysis.  140 S. Ct. 1613 (Roberts, C.J., concurring).[5]  Chief Justice Roberts recognized that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *Id.* (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)) (alteration in original).  The latitude of officials "must be especially broad" when acting "in areas fraught with medical and scientific uncertainties."  *Id.* (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)).  If officials do not exceed these broad limits, "they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."  *Id.* at 1613–14 (quoting *Garcia v. San Antonio Metro. Transit Auth.* 469 U.S. 528, 545 (1985)).  This is particularly true when "a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground."  *Id.* at 1614.  In such

---

[5]  While *South Bay* did not concern Equal Protection or Due Process claims, it denied an application for injunctive relief to enjoin enforcement of the California governor's executive order restricting attendance at places of worship.  Notably, Chief Justice Roberts focused on the deference paid to local governments concerning matters of health and safety, and not the standards typically applied to constitutional claims, i.e., strict scrutiny to assess a free exercise claim under the First Amendment.

circumstances, "[t]he notion that it is 'indisputably clear' that the Government's limitations are unconstitutional seems quite improbable." *Id.*

Courts presented with emergency challenges to governor-issued orders temporarily restricting activities to curb the spread of COVID-19 have consistently applied *Jacobson v. Massachusetts* to evaluate those challenges.[6] *See*, *e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, __ F.3d __, No. 20-1581, 2020 WL 3468281, at *2 (6th Cir. June 24, 2020) (collecting cases); *Slidewaters LLC v. Wash. Dep't of Labor & Indus.*, No. 2:20-CV-0210-TOR, 2020 WL 3130295, at *4 (E.D. Wash. June 12, 2020); *Prof'l Beauty Fed'n of Cal. v. Newsom*, No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126, at *5 (C.D. Cal. June 8, 2020) (collecting cases); *Altman v. County of Santa Clara*, __ F. Supp. 3d __, No. 20-cv-02180-JST, 2020 WL 2850291, at *7 (N.D. Cal. June 2, 2020) ("Although Plaintiffs attempt to dismiss *Jacobson* as 'arcane constitutional jurisprudence,' . . . the case remains alive and well – including during the present pandemic." (citation omitted)); *Six v. Newsom*, __ F. Supp. 3d __, No. 8:20-cv-00877-JLS-DFM, 2020 WL 2896543, at *3 (C.D. Cal. May 22, 2020).

According to *Jacobson*, the liberties secured by the Constitution do "not import an absolute right in each person to be, at all times and in all circumstances,

---

[6] Plaintiffs argue that *Jacobson* is inapplicable.  But the cases they rely upon did not address *South Bay*.  Indeed, one case preceded *South Bay* and the order in the other case issued the same day as *South Bay*.

wholly freed from restraint.  There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson*, 197 U.S. at 26.  It is a "fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state." *Id.* (citation and internal quotations marks omitted).  When an epidemic of disease threatens the safety of a community's members, it "has the right to protect itself." *Id.* at 27.  And commensurate with that right is a state's authority "to enact quarantine laws and health laws of every description." *Id.* at 25 (internal quotations marks omitted).

Defendant's Emergency Proclamations—purporting to protect public health during the COVID-19 pandemic—are not susceptible to Plaintiffs' constitutional challenges unless they have "no real or substantial relation to" the crisis or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31 (citations omitted).  Indeed, "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency." *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020).  And "the judiciary may not 'second-guess the state's policy choices in crafting emergency public health measures.'" *In re Rutledge*, 956 F.3d 1018, 1029 (8th Cir. 2020) (quoting *Abbott*, 954 F.3d at 784).

14

1.   <u>Real or Substantial Relation to Public Health</u>

Defendant argues that the self-quarantine orders were designed to prevent the importation and intrastate spread of COVID-19 and that restrictions on non-essential businesses are necessary to maintain social distancing and stem the spread of community transmission.  Defendant successfully demonstrates that his Emergency Proclamations have a real or substantial relation to the public health crisis caused by the COVID-19 pandemic.

Dr. Sarah Park, Hawaiʻi's State Epidemiologist, avers that restrictions on non-essential businesses, stay-at-home orders, and quarantines (interstate and intrastate) were imposed to minimize the spread of COVID-19.  Opp'n, Decl. of Sarah Y. Park, M.D. ("Park Decl."), ECF No. 33-2 ¶¶ 16–17.  Dr. Park advised Defendant about the necessity of both the interstate and intrastate quarantines and determined that a 14-day quarantine was appropriate because that is the estimated length of COVID-19's maximum incubation period.  *Id.* ¶¶ 19–20.  Dr. Park opines that due to the measures undertaken by Defendant, Hawaiʻi's infection and death rates have remained low and that the implementation of the Emergency Proclamations met the goal of flattening the curve and slowing infections to a rate that would prevent the health system from becoming overwhelmed.  *Id.* ¶¶ 9, 30. According to Dr. Park, the quarantine remains in effect because absent a vaccine or cure, the following non-exhaustive benchmarks must be met to lift it:  "ensuring all

businesses, schools, healthcare facilities are following safe practices; increasing its

contact tracing capability; working to establish protocols for testing travelers prior

to their arrival; ensuring a continuously stable and adequate supply of testing

supplies and personal protective equipment; and increasing the state's daily testing

capacity." *Id.* ¶ 28.  Dr. Park hopes that utilizing these benchmarks will allow for

safe re-opening of trans-Pacific travel without risking a second wave of infection.

*Id.*

    Dr. Steven Hankins, Lead Coordinator for Emergency Support Function-8

with the Hawaiʻi Emergency Management Agency ("HI-EMA"), states that

according to HI-EMA's model, if not for the quarantine, more than 25,000

cumulative COVID-19 patients in Hawaiʻi would have required hospitalization by

the end of July 2020 and more than 5,000 deaths would have occurred by July 23,

2020.  Opp'n, Decl. of Steven Hankins, M.D. ("Hankins Decl."), ECF No. 33-3 ¶

7.  Based on the number of licensed hospital beds in Hawaiʻi, and given the

number typically occupied by non-COVID-19 patients, Dr. Hankins estimates that

Hawaiʻi would have exceeded bed capacity on or around June 28, 2020,[7] which

would have prevented the acute care system from providing necessary care and

---

[7]  Dr. Hankins provides a date of "06/28/2000," which appears to be a
typographical error.

"led to significant excess deaths both from COVID-19 and from the other conditions which require hospital care." *Id.* ¶¶ 10–11.

The foregoing establishes that the Emergency Proclamations bear a real or substantial relation to public health. *See*, *e.g.*, *Altman*, 2020 WL 2850291, at *9 (concluding that the subject order bears "a real or substantial relationship to the legitimate public health goal of reducing COVID-19 transmission and preserving health care resources" (citations omitted)); *Prof'l Beauty*, 2020 WL 3056126, at *6 ("In this case, the Court finds that California's Stay at Home Order bears a real and substantial relation to public health insofar as it bars cosmetologists from working."); *Rutledge*, 956 F.3d at 1029 ("On the record before us, the State's interest in conserving PPE resources and limiting social contact among patients, healthcare providers, and other staff is clearly and directly related to public health during this crisis.  That interest is being effectuated by the ADH directive.  The directive is a legally valid response to the circumstances confronted by the Governor and state health officials."); *Abbott*, 954 F.3d at 787 ("In sum, it cannot be maintained on the record before us that GA-09 bears 'no real or substantial relation' to the state's goal of protecting public health in the face of the COVID-19 pandemic." (citation omitted)).

Plaintiffs' theory that no emergency exists here or throughout the United States is contradicted by the record and readily available information.[8]  With the lifting of restrictions in Hawaiʻi, COVID-19 cases have increased.  Park Decl. ¶ 41.  And across the country, there is a resurgence in cases following the loosening of restrictions.  *Id.* ¶¶ 22, 29, 39–40.  Plaintiffs have not refuted Defendant's proffered bases for the Emergency Proclamations—all of which have a real or substantial relation to public health—especially where, as here, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement."  *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  It is not the Court's role to "usurp the functions of another branch of government," *Jacobson*, 197 U.S. at 28, by second-guessing the State's bases for formulating and extending public health and safety measures.  It is "the duty of the constituted authorities primarily to keep in view the welfare, comfort, and safety of the many, and not permit the interests of the many to be subordinated to the wishes or convenience of the few."  *Id.* at 29.

---

[8]  Plaintiffs rely entirely on the declaration of an economist to contend that there is no emergency.  *See* Appl., Decl. of Joel W. Hay, Ph.D, ECF No. 12-3 ¶ 36 ("[I]t is my professional opinion that 14-day quarantines are ineffective because there is no emergency in Hawaii or the United States.").  Plaintiffs appear to disregard any role the Emergency Proclamations may have played in limiting COVID-19 cases and deaths, instead relying solely on those numbers as evidence of a lack of emergency.

2.    <u>Plain, Palpable Invasion of Rights Secured by the Constitution</u>

The Court now considers the second *Jacobson* inquiry:  whether the

Emergency Proclamations are "*beyond question*, in palpable conflict with the

Constitution."[9]  *Jacobson*, 197 U.S. at 31 (emphasis added).  And more precisely,

whether they cause a "plain, palpable invasion" of Plaintiffs' Fifth and Fourteenth

Amendment rights.  *Id.*  The Court concludes they do not, whether under

traditional levels of scrutiny or *Jacobson*'s highly deferential standard.

a.    <u>Right to Travel (Count 1)</u>

Plaintiffs claim that the Emergency Proclamations violate their fundamental

right to travel between states under the Fifth Amendment.  Appl. at 14; Compl. ¶¶

84–85.  This claim necessarily fails because "the Fifth Amendment's due process

clause only applies to the federal government."  *Bingue v. Prunchak*, 512 F.3d

1169, 1174 (9th Cir. 2008) (citations omitted).  It "prohibits the federal

government from depriving persons of due process, while the Fourteenth

Amendment explicitly prohibits deprivations without due process by the several

States."  *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005) (citation

omitted).

---

[9]  "Although courts have not yet defined the precise contours of this standard, it plainly puts a thumb on the scale in favor of upholding state and local officials' emergency public health responses."  *Prof'l Beauty*, 2020 WL 3056126, at *7 (citation omitted).

Even if Plaintiffs invoked the proper constitutional provision, they would not be entitled to injunctive relief.  Although "'travel' is not found in the text of the Constitution," the "'constitutional right to travel from one State to another' is firmly embedded in [Supreme Court] jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citation omitted).  The "right to travel" has three components, two of which are relevant here:  (1) "the right of a citizen of one State to enter and to leave another State," and (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State." *Id.* at 500. "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses 'any classification which serves to penalize the exercise of that right.'" *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality opinion) (citations omitted).

Plaintiffs characterize the 14-day travel quarantine as a travel ban when it is not.  In fact, the 14-day travel quarantine violates neither of the two components of the right to travel identified above, as individuals from other states may freely travel to Hawaiʻi; they must simply comply with the quarantine, a requirement *equally applicable to Hawaiʻi residents*.  This limited restriction (not ban) is a reasonable one.  We are in the middle of a pandemic, and even Plaintiffs' counsel voluntarily acknowledged at the hearing that the COVID-19 crisis is serious.

In their Reply, Plaintiffs attempt to expand their claim, arguing that interstate and intrastate travelers are treated differently because individuals already in Hawai'i may travel between islands, while those traveling from the mainland are subject to the quarantine.[10]  Reply at 8.  This is a failed effort to create a distinction where none exists.  Just as non-residents traveling to Hawai'i are restricted from traveling between islands, so, too, are residents returning from the mainland.  Conversely, residents and non-residents may freely travel intrastate if they are not quarantined.

Plaintiffs present comments Defendant made to the Associated Press on May 4, 2020 as evidence that the quarantine was designed to bar interstate movement and reduce the number of visitors to Hawai'i.  Defendant stated:  "We are the most isolated community on the planet . . . . As such, we've got to be more self-reliant, but we also had the opportunity to enact a quarantine, make it meaningful and most

---

[10]  Plaintiffs also attempt to manufacture a classification between those traveling *to* Hawai'i and those *leaving* Hawai'i:  "Americans traveling from the mainland are subject to Governor Ige's 14-day mandatory quarantine, while Americans traveling from Hawaii to the mainland or from island to island are not."  Reply at 9.  It is axiomatic that those traveling to the mainland would not be subject to Hawaii's quarantine once they leave.  This distinction is irrelevant in any event because the right to travel concerns differentiation between residents and non-residents.  No such distinction exists here.  All who leave Hawai'i for the mainland—non-residents and residents alike—will not be subject to Hawaii's quarantine on the mainland, though they will be subject to any quarantine requirements imposed by another state.

importantly, know that we could really dramatically reduce the number of visitors we get." Reply, Ex. 5, ECF No. 40-6.[11] This singular statement does not change the neutral nature of the quarantine itself. *See Altman*, 2020 WL 2850291, at *12 ("Courts applying *Jacobson* to other COVID-19 restrictions have found that facial neutrality weighed in favor of upholding them." (citations omitted)). Neither does it alter the primary objective of the Emergency Proclamations, which is to limit the importation and spread of COVID-19 and to prevent the health care system from becoming overwhelmed.

Plaintiffs further contend that the quarantine deters travel because they deem it "impossible" to fulfill their purposes for traveling and complete the quarantine. While not its intended purpose, the quarantine appears to have some deterrent effect, as evidenced by the depressed visitor numbers. But any deterrent effect the quarantine may have on Plaintiffs' travel to Hawaiʻi does not amount to a violation of their right to travel. We are not here dealing with a quarantine or Emergency Proclamations with a *purpose* of deterring Plaintiffs (or other out-of-state travelers) from entering Hawaiʻi. *See*, *e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969),

---

[11] Despite acknowledging that Defendant made this statement weeks before they filed their lawsuit, Plaintiffs waited until the Reply to offer it as evidence in support of their Application. Simply put, this tactic undermines the notion that a party should present all evidence in support of its request at the outset so that the opposing party has an opportunity to respond. Nonetheless, because the Court permitted Defendant to respond at the hearing, it will consider this evidence.

overruled on other grounds by *Edelman v. Jordan*, 415 U.S. 651 (1974) ("[T]he *purpose* of deterring the in-migration of indigents cannot serve as justification for the classification created by the one-year waiting period, since that purpose is constitutionally impermissible." (emphasis added)).  Indeed, "not everything that deters travel burdens the fundamental right to travel.  States and the federal government would otherwise find it quite hard to tax airports, hotels, moving companies or anything else involved in interstate movement."  *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009).  Because the non-resident Plaintiffs are not barred from entry into and out of Hawaiʻi nor are they treated differently than residents, there is no plain, palpable conflict with the Fourteenth Amendment.

Even assuming the quarantine imposed a burden on Plaintiffs' right to travel, thereby triggering strict scrutiny, *see Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 262 n.21 (1974), Plaintiffs would nevertheless be unable to show a likelihood of success on the merits or a serious question going to the merits.  To survive strict scrutiny, the quarantine must be "narrowly tailored to promote a compelling governmental interest."  *Nunez ex rel. Nunez v. City of San Diego*, 114 F.3d 935, 946 (9th Cir. 1997) (citing *Plyler v. Doe*, 457 U.S. 202, 217 (1982)); *see Soto-Lopez*, 476 U.S. at 904 & n.4 (citations omitted).

Defendant imposed the quarantine to prevent the importation and spread of COVID-19 and to avoid overwhelming the health care system, which are

23

compelling state interests.  And the quarantine is narrowly tailored because asymptomatic individuals can spread the disease, COVID-19 has an estimated 14-day incubation period, and it is unclear that there are less restrictive means to achieve Defendant's stated interests.  Moreover, from August 1, 2020, the trans-Pacific pre-testing program will allow travelers to waive the quarantine requirement if they obtain a negative COVID-19 test within 72 hours of arrival and provide proof upon landing.[12]  Anderson Decl. ¶ 8.  Any traveler exhibiting signs of infection will undergo secondary screening and be offered a COVID-19 test at the airport.  *Id.*

Accordingly, based on the record presently before it, the Court finds that the quarantine survives strict scrutiny and Plaintiffs cannot *at this time* establish a likelihood of success or raise a serious question going to the merits of their right to travel claim.  *See*, *e.g.*, *Bayley's Campground Inc. v. Mills*, __ F. Supp. 3d __, No. 2:20-cv-00176-LEW, 2020 WL 2791797, at *1, 11 (D. Me. May 29, 2020) (finding that Maine's quarantine restrictions—prohibiting non-residents from sheltering there "unless they own or can rent property in Maine where they can quarantine themselves for 14 days"—burdened the plaintiffs' "right to travel," but

---

[12]  The implementation of the trans-Pacific pre-testing program does not undercut the reasonableness of the restrictions currently in place.  What will be feasible next month was not necessarily possible earlier in the crisis because of benchmarks that must be met.  Park Decl., ECF No. 33-2 ¶ 28.

nevertheless concluding that they did not show a likelihood of success because "[i]t is not at all clear that there are any less restrictive means for the state to still meet their goal of curbing COVID-19").

      b.    <u>Due Process (Counts 2 and 4)</u>

Plaintiffs allege that the Emergency Proclamations violate their liberty rights and do not offer a process by which to challenge the Emergency Proclamations prior to or following their implementation.  As with Count 1, Plaintiffs invoke the wrong constitutional provision and are not entitled to relief on that basis alone.  But even construing this as a Fourteenth Amendment claim, Plaintiffs are unlikely to succeed on the merits and fail to raise serious questions going to the merits.

      i.    <u>Substantive Due Process (Count 2)</u>

Count 2 is largely comprised of historic legal principles from Supreme Court cases without clear articulation of Plaintiffs' claims against Defendant.  Plaintiffs allege, in conclusory fashion, that the Emergency Proclamations violate their fundamental liberty interests, namely their right to travel, right to earn a living, and freedom from house arrest.  Compl. ¶ 104.

The substantive component of the Due Process Clause of the Fourteenth Amendment "protects certain individual liberties from state interference." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (alteration in original)

(citations omitted).  "[O]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause."  *Id.* (citation omitted).  Therefore, substantive due process is "largely confined to protecting fundamental liberty interests, such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.'"  *Id.* (citations omitted); *see also Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007) ("A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." (citation omitted)).

The Court addressed the right to travel above.  In the Application, Plaintiffs focus on the deprivation of liberty caused by the quarantine and stay-at-home mandate, which they equate with a *state-wide confinement whether or not one is infected with COVID-19*.  Appl. at 15–16.  To the extent Plaintiffs' request for relief is predicated on a stay-at-home mandate, they cannot show a likelihood of success on the merits or raise serious questions going to the merits.  Hawaiʻi is currently in an act-with-care phase, which took effect on May 18, 2020.  Opp'n, Exs. G–H.  On May 5, 2020, a safer-at-home phase replaced the stay-at-home

phase.[13]  *Id.*, Ex. F.  Neither the safer-at-home nor act-with-care phases confine

non-quarantined residents or visitors to their homes/lodging, so this claim lacks

any basis.

Plaintiffs fare no better with their claim that the quarantine violates their

fundamental rights.  Although the right to travel within the United States is

constitutionally protected, that does not mean that a temporary quarantine cannot

be instituted in certain areas when evidence shows that unlimited travel there

would directly and materially interfere with the safety and welfare of that area.  *See*

*Zemel v. Rusk*, 381 U.S. 1, 15–16 (1965).  As discussed above, assuming the

quarantine is subject to strict scrutiny instead of the highly deferential *Jacobson*

standard, it is narrowly tailored to promote a compelling governmental interest—

preventing the importation and spread of COVID-19 and avoiding an overwhelmed

health care system.  Thus, Plaintiffs are unlikely to succeed on the merits and they

have not raised serious questions going to the merits.

ii.    Procedural Due Process

Plaintiffs do not delineate between substantive and procedural due process,

but they appear to assert a procedural due process claim—entitlement to and

deprivation of some process with respect to the issuance of the Emergency and

---

[13]  This tends to demonstrate that Defendant is employing a tiered and measured reopening strategy with a goal of imposing only those restrictions deemed necessary to promote public health and safety.

Supplementary Proclamations.  Appl. at 21; Compl. ¶ 138 ("Governor Ige's emergency orders provide for no opportunity for a hearing; no appeal; no reconsideration, notwithstanding that the Governor ordered house arrest for all people in Hawaii, engaged in the promulgation of administrative regulations and legislative prerogatives.").

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  These protections notwithstanding, the Supreme Court has determined that "summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) (citations omitted).  A "deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." *Id.* (alteration in original) (citations omitted). COVID-19 is an unprecedented emergency.  And despite Plaintiffs' effort to downplay and negate its seriousness—driven by their apparent desire to "leave quarantine to enjoy Hawaii for 14 days"[14]—it is precisely the type of emergency situation requiring Defendant to act expeditiously.  Moreover, because the Emergency Proclamations affect the entire State, they "do not give rise to the

_____

[14]  Reply at 10.

constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994). The constantly evolving situation could not reasonably allow Plaintiffs to challenge every supplementary proclamation before it issues. Plaintiffs cannot persuasively argue that they have suffered a meaningful deprivation of process. Based on the foregoing, this claim is unlikely to succeed on the merits, and it does not raise serious questions going to the merits.

### c.   Equal Protection (Counts 3 and 4)

Plaintiffs allege that Defendant's arbitrary categorization of business as essential or non-essential precludes them from making a living and results in disparate treatment in violation of their equal protection rights under the Fourteenth Amendment. Compl. ¶¶ 120–21. Plaintiffs argue that allowing certain activities while prohibiting others is similarly violative. *Id.* ¶¶ 144–45.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler*, 457 U.S. at 216). The Supreme Court has "repeatedly held that 'a classification neither involving fundamental rights nor proceeding along suspect

29

lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'" *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 127–28 (1999) (alteration in original) (citations omitted); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) ("To withstand Fourteenth Amendment scrutiny, a statute is required to bear only a rational relationship to a legitimate state interest, unless it makes a suspect classification or implicates a fundamental right." (citations omitted)).

The basis for this claim is unclear.  Plaintiffs dispute Defendant's categorization of activities as authorized/unauthorized and businesses as essential/non-essential.  But to the extent Plaintiffs argue that these categorizations infringe upon their fundamental right to work, the Emergency Proclamations do not affect them.  The Carmichaels and Hirsch reside on the mainland and McGowan has not alleged that the Emergency Proclamations interfere with her ability to work at all; her contention is that the quarantine "makes it impossible" for her to travel to the mainland due to the restrictions she will face upon her return.  Given the circumstances, Plaintiffs cannot establish a likelihood of success on the merits and they have not raised serious questions going to the merits.

In sum, Plaintiffs have failed to show a likelihood that they would succeed on the merits of their claims, let alone a strong likelihood of success, as is required for a mandatory injunction. Nor have Plaintiffs raised serious questions going to the merits as to any of their claims. Consequently, they are not entitled to a TRO.

### B.   Irreparable Harm

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). As a prerequisite to injunctive relief, "a plaintiff must *demonstrate* immediate threatened injury"; a speculative injury is not irreparable. *Id.* (citations omitted). "Irreparable harm is . . . harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). "[A]n alleged constitutional infringement will often alone constitute irreparable harm," *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citation omitted), but not if "the constitutional claim is too tenuous." *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).

Plaintiffs argue that the deprivation of their constitutional rights causes them irreparable harm, with each day bringing further injury, and no damages can adequately compensate them for their loss of time and freedom. As discussed

31

above, Plaintiffs' declarations explain only why they have elected not to travel to Hawai'i due to the potential issues that could arise from having to quarantine, or claim, without supporting explanation or evidence, that undergoing the quarantine is impossible.  These cursory and speculative assertions insufficiently *demonstrate* immediate threatened injury and considering Plaintiffs' failure to show a likelihood of success on the merits, their constitutional claims are too attenuated to establish irreparable harm.

C.   <u>Balance of Equities/Public Interest</u>

Plaintiffs view their harm as so significant that *any* continuation of the quarantine would irreparably violate their right to travel, whereas Defendant would suffer no hardship.  Reply at 12.  They also suggest that it is in Hawaii's best interest to allow its residents to travel, associate, and be free from government restraint.  *Id.*

In assessing whether Plaintiffs establish that the balance of equities tip in their favor, "the district court has a 'duty . . . . to balance the interests of all parties and weigh the damage to each.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).  When an injunction's impact "reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction."  *Id.* at 1139 (citations omitted).  Indeed, "[t]he public interest inquiry primarily

32

addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted).  It also requires the Court to "consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Cottrell*, 632 F.3d at 1138 (citation omitted); *Stormans*, 586 F.3d at 1139 ("[C]ourts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted)).

Here, the equities weigh heavily against Plaintiffs.  At its core, this case is about the non-resident Plaintiffs' desire to travel to their vacation homes without restriction and McGowan's desire to travel to the mainland without facing a quarantine when she returns home.  But the desires of a few cannot override the community's interest in preserving its health and well-being.

As discussed above, the restrictions imposed by the Emergency Proclamations were designed to slow the spread of COVID-19, and they arguably have.  Serious consequences could result to the public if Defendant is enjoined from enforcing the Emergency Proclamations at this time, as doing so would undermine his ongoing efforts to *safely* reopen the state to travelers and ease restrictions on residents and visitors.

Until Defendant implements the components of Hawaii's risk mitigation strategy,[15] a sudden, wholesale lifting of all restrictions in the Emergency Proclamations would be highly detrimental and disruptive.  Defendant is confronting a dynamic situation fraught with uncertainty.  In these unprecedented times, it is not the Court's role to second-guess the decisions of state officials who have the expertise to assess the COVID-19 pandemic and institute appropriate measures to minimize its impact to this community.  *See Stormans*, 586 F.3d at 1139 ("[When] an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." (alteration in original) (citation omitted)).  Under these circumstances, a TRO would not be in the public's interest.

## CONCLUSION

For the reasons stated herein, the Court HEREBY DENIES Plaintiffs' Application for Temporary Restraining Order and for Order to Show Cause Why a Preliminary Injunction Should Not Issue.  ECF No. 12.

---

[15]  Anderson Decl. ¶ 7.

IT IS SO ORDERED.

DATED:      Honolulu, Hawai'i, July 2, 2020.

Jill A. Otake
United States District Judge

CIVIL NO. 20-00273 JAO-WRP; *Carmichael, et al. v. Ige*; ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE